UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

<u>MMG Insurance Co.</u>

v.

<u>Samsung Electronics</u>
<u>America, Inc. and</u>
<u>Best Buy Co., Inc.</u>

Civil No. 11-cv-430-JL
Opinion No. 2013 DNH 061

**<u>MEMORANDUM ORDER</u>**

This action arises out of a house fire that allegedly
started in a home theater system manufactured by defendant
Samsung Electronics America, Inc., and sold by defendant Best Buy
Co., Inc.  By way of subrogation, plaintiff MMG Insurance Co.,
which insured the house and its contents, seeks to recover
against the defendants for the property damage that its
policyholders suffered in the fire, bringing state-law claims of
negligence, strict products liability, and breach of warranty.
This court has jurisdiction under 28 U.S.C. § 1332(a)(1)
(diversity), because MMG is a Maine corporation with its
principal place of business there, Best Buy is a Minnesota
corporation with its principal place of business there, and
Samsung is a New York corporation with its principal place of
business in New Jersey.

The defendants have moved for summary judgment.  <u>See</u> Fed. R.
Civ. P. 56.  Like many a defendant in a products liability case,

they argue that MMG's designated experts, who plan to testify that the defendants' product caused the fire, are unqualified to give those opinions, which are also not based on reliable principles and methods. See Fed. R. Evid. 702. The defendants point out that, without such testimony, MMG cannot prove any of its claims. As is often the case, however, the objections that the defendants raise to MMG's proffered opinion testimony go to its weight, not its admissibility (at least so far as the court can understand those objections from the materials submitted so far).[1] As explained more fully below, the defendants' motions to exclude certain of MMG's expert witnesses are denied without prejudice to the defendants' ability to renew their objections to testimony by those witnesses at trial. But it follows that the defendants are not entitled to summary judgment due to MMG's lack of expert testimony that the DVD player caused the fire.

The defendants also seek summary judgment on an alternative ground. They argue that the case should be dismissed because, following the fire, MMG failed to restrict access to the premises, and that its own investigators improperly manipulated

---

[1]In fact, counsel for the defendants, who is highly experienced in defending products liability actions, acknowledged at oral argument that he had never prevailed on a motion to exclude proffered expert testimony on the ground that it failed to satisfy Rule 702 (though he said he had achieved rulings limiting the scope of such testimony in some cases).

the evidence.  But the defendants have shown neither the degree of culpability, nor the resulting prejudice, that would warrant dismissal of the case as a sanction for that conduct (though the defendants are free to seek other relief, including a spoliation instruction to the jury at trial).

After hearing oral argument, the court denies the defendants' motion for summary judgment.

## I.   **Applicable legal standard**

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A dispute is "genuine" if it could reasonably be resolved in either party's favor at trial, and "material" if it could sway the outcome under applicable law.  See Estrada v. Rhode Island, 594 F.3d 56, 62 (1st Cir. 2010).  In analyzing a summary judgment motion, the court "views all facts and draws all reasonable inferences in the light most favorable to the non-moving" party.  Id.  The following facts are set forth in accordance with this standard.

## II.  **Background**

On March 9, 2009, in the early afternoon, firefighters from the Manchester Fire Department responded to the report of a fire

at a single-family home owned by Mark and Helen Berthiaume.
Nobody was home at the time.

After the fire was extinguished, Mitchell Cady, an
investigator with the department, examined the scene, taking a
number of photographs.  Cady concluded that the fire originated
in the living room, in the "entertainment center"--a cabinet that
contained, among other things, a television, cable box, Wii video
game system, and home theater system.  While Cady could not
determine the "exact" cause of the fire, he concluded that it was
not intentionally set, and that "it was most likely caused by an
electrical malfunction involving one or more of" these devices.
There is no dispute in this case, in fact, that the fire
originated in the area of the entertainment center.

Within the entertainment center, the home theater system was
positioned atop the cable box, on the left-hand side (facing the
cabinet) of a shelf below the television.  The Wii was positioned
on the right-hand side of that shelf, on the other side of a
partition that divided the shelf into its left and right sides.
The television was positioned on the shelf above these other
components.  The home theater system, manufactured by defendant
Samsung, consisted of a five-disc player with a power supply,
amplifier, and tuner, contained within a metal cabinet.  While
the top of the home theater cabinet was a solid sheet of steel,

4

vents were placed in the bottom, including underneath the power supply.  A cooling fan was mounted in the rear of the unit.

On March 14, 2009, two investigators, Robert Long and Gary Simard, examined the scene on behalf of MMG, the Berthiaumes' property insurer.  Long acknowledges that "the scene was unprotected for five days prior to [their] arrival" and that, when they arrived, "there were people in there from the cleaning company and the board-up company."  Following "fire patterns" in the structure, Long and Simard focused on the remains of the entertainment center, noting that it, as well as "some of the debris," had been moved away from the wall prior to their arrival.  Nevertheless, "a substantial amount of debris remained," which the investigators "systematically cleared . . . via the layering method," i.e., "removing debris from the top down and observing the relative location of artifacts."  In this process, they removed "anything that looked electrical, wiring or anything like that," placing it in bags, leaving the rest of the debris, which was "structure-related," in place.

Long and Simard also encased the entertainment center in shrink wrap and moved it from the living room into the garage (an area of the house that had not sustained any damage in the fire).  Simard explained that they did this so that the workers on the site could secure the living room ceiling above the entertainment

5

center, which had sustained heavy damage in the fire.  Before
wrapping and moving the entertainment center, Simard and Long
examined and took photographs of it.

Following the investigation, which also included
interviewing Mark Berthiaume and reviewing Cady's report, Long
prepared a report concluding that "the fire originated within the
entertainment center . . . .  Further evidence indicates the fire
originated in the . . . cable box or the . . . DVD player," i.e.,
home theater system.  Those devices, as just stated, were located
in the left-hand compartment of the shelf below the television.
The report explains that the partition separating this
compartment from the right-hand side of the compartment (housing
the Wii) showed "fire damage that was greater on the left side
than on the right side" and "directional toward the lower section
of the shelf."  This directional fire damage aligned with a
"distinct thermal pattern . . . on the right side of the cable
box and the underside of the DVD player."

At his deposition, Simard acknowledged the possibility that
the burn pattern on the shelf partition could have come from the
television, had it caught fire and fallen down from the shelf
above.  But he explained he did not think this was the case
principally because, had the fire started in the television, it
would have caused "more consistent burning on the appliances all

the way across," rather than just on the left-hand side.  Simard acknowledged, however, that the shelf holding the television (which had been positioned above the home theater system) was not recovered from the scene and that, while he believed it had been consumed in the fire, "[i]t could have been thrown out by the firefighters."

A second inspection of the scene occurred on March 15, 2009, the day after Long and Simard had first visited.  Present at this inspection were representatives of the manufacturers of the various devices within the entertainment center, who had been notified and invited by MMG, including a consultant and an attorney who attended on behalf of Samsung.  Among those who attended on behalf of MMG was an engineering consultant, Steven R. Thomas.  During this inspection, certain items, including the entertainment center, were identified for packaging and transport to a laboratory facility in Massachusetts, where they were further examined by Thomas, among others.  Thomas also acquired and tested an exemplar of the same model of Samsung home theater system found in the Berthiaumes' home, and reviewed Cady's report and the accompanying photographs.

Thomas then prepared a report concluding that the fire was "a result of a component failure/overheating of the power supply" in the DVD player.  The report explains that:

7

> The burn patterns and configuration of the Samsung home
> theater system and [cable box] clearly established this
> location for point of ignition.  The fire damage was
> most intense and concentrated in the area of the
> Samsung power supply.  This area is covered by a steel
> sheet which would have protected the internal
> components had ignition occurred above or behind the
> unit.  This area of the Samsung home theater [system]
> had a power source and would remain at an elevated
> temperature if the system was simply left on.  The
> [cable box] had no power sources in the affected area
> and the power supply which was on the opposite side of
> the unit remained generally intact.

Thomas testified that, although the shelf that held the

television was not recovered from the scene, its condition after

the fire supported his conclusion that ignition occurred inside

the home theater unit, because Cady's photographs show "basically

some charring of the underside of the shelf," with its thickness

"essentially intact."  Thus, Thomas explained, "the shelf, as

well as the top of the Samsung unit, . . . would have protected

the damaged components within the Samsung unit from the fire

event had it originated at a level up above that shelf, such as

the television."  In fact, Thomas testified that the "the burning

of the interior of the Samsung unit" made him confident that the

television was not the source of the fire.  He maintains this

confidence even though there were portions of the television that

he would have expected to survive the fire that were nevertheless

not recovered from the scene.

## II.  Analysis

## A.  Plaintiff's expert witnesses

MMG has designated both Simard and Thomas to serve as expert witnesses in this matter.  The defendants have moved to preclude any expert testimony from either as to the cause or the origin of fire, objecting that it is inadmissible under Rule 702 of the Federal Rules of Evidence.  Under Rule 702,

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.  As the structure of this rule suggests, before the factfinder in a case can consider expert testimony over the adverse party's objection, the trial judge, serving as "gatekeeper," must determine whether the testimony satisfies the relevant foundational requirements.  See Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 597 (1993).

The defendants argue that the anticipated expert testimony from both Simard and Thomas as to the cause and origin of the fire fails to meet the requirements of Rule 702 in two respects. The defendants argue that (1) neither Simard nor Thomas is qualified to give expert testimony as to the cause or origin of

9

the fire and (2) the methodology that each expert used to support his opinions on that point "is biased, lacks factual or scientific support, and is nothing more than speculative conjecture."  As explained below, the court disagrees, at least based on the materials before it at present.  Conspicuous by its absence from these materials is anything from the defendants' own retained experts, including, most significantly, anything criticizing their counterparts' methodology.  The court therefore denies the defendants' motions to exclude testimony from Simard and Thomas without prejudice to the defendants' ability to renew their objections to that testimony later in these proceedings.[2]

### 1.  **Simard**

The defendants' objection to Simard as unqualified is difficult to take seriously.  Simard, who spent nearly 30 years as a firefighter before retiring in 2009, has investigated more than 500 fires.  Since 2009, he has worked as a field investigator for a Maine-based fire investigation and analysis

---

[2]It is therefore unnecessary (for now at least) to resolve the parties' intense dispute about the timeliness of the defendants' motions to exclude Simard and Thomas.  MMG has moved to strike those motions by filing two separate motions of its own, while the defendants have filed two more motions, each seeking to allow the filing, nunc pro tunc, of one of its motions to exclude.  MMG's motions to strike, and the defendants' motions to allow the filings of the motions to exclude, are all denied as moot, since the defendants' original motions to exclude Simard and Thomas are denied on the merits.

consultancy, Fire & Explosion Investigation, Inc., and holds a number of licenses or certifications as a fire investigator, including from the state of Maine, the International Association of Arson Investigators, and the National Association of Fire Investigators.  He also holds an undergraduate degree in fire science and has attended numerous courses and seminars on fire investigation over the past 20 or so years.

The defendants nevertheless argue that Simard is unqualified to opine as to the origin of the fire in this case due to a "lack of expertise with respect to fires where the suspected cause is electric energy."[3]  But Simard testified at his deposition that he has, in fact, investigated electrical fires (as one would expect of someone who has investigated hundreds of fires) as well as taken courses in investigating fires where the suspected cause is an electrical appliance.  In any event, while a witness offering opinions under Rule 702 "should have achieved a meaningful threshold of expertise in the given area," he need not possess "overly specialized knowledge."  Levin v. Dalva Bros.,

---

[3]The defendants also point out that, prior to now, Simard "has only testified twice" and "never been qualified as an expert witness on the subject of [fire] origin and cause investigations . . . in a civil case."  The court is at a loss to see what this says about Simard's "knowledge, skill, experience, training, or education" in the subject-matter of his testimony under Rule 702. That rule, after all, requires a witness giving opinion testimony on a subject to be an expert in the field--not to be an expert at being a witness.

Inc., 459 F.3d 68, 78 (1st Cir. 2006) (quotation marks omitted). So the fact that Simard is an expert in investigating fires in general, rather than in investigating electric fires specifically, does not disqualify him from opining that the fire at issue here originated from an electrical source. See Warford v. Indus. Power Sys., Inc., 553 F. Supp. 2d 28, 34 (D.N.H. 2008) (ruling that witness's many years of investigating maritime accidents qualified him to opine that defendants' actions had caused an electrical fire on a vessel, despite his lack of "experience or training in electrical matters").

The defendants' objection to Simard's anticipated testimony as "biased, speculative, and therefore, unreliable" fares no better.[4]  The defendants mention three alleged deficiencies in Simard's methodology:

> (a) he did not account for the shelf from the entertainment center that held the television;
>
> (b) he identified neither "the first material ignited nor the ignition sequence;" and
>
> (c) he did not employ "re-creatable" testing of his theory of the fire's origin.

---

[4]The defendants do not explain what they mean when they say Simard's opinion is "biased," or how, in any event, that would disqualify him from offering it under Rule 702.  It is true that MMG hired Simard (through his employer) to investigate the fire, and now wants him to testify as to the results of his investigation at trial, but that sort of "bias" is present with nearly every retained expert, and, of course, can be fully explored by the defendants in cross-examining Simard.

12

Based on these alleged flaws, the defendants attempt to
characterize Simard's approach as inconsistent with the National
Fire Protection Association's Guide for Fire and Explosion
Investigations, known as NFPA 921 and generally recognized as a
reliable methodology for investigating the cause of fires.  See
Adams v. J. Meyers Builders, Inc., 671 F. Supp. 2d 262, 273
(D.N.H. 2009).

The court finds the defendants' characterizations strained.
They fall well short of rendering inadmissible Simard's opinion
that the fire originated in either the cable box or the home
theater.  Specifically,

> (a) even if Simard was wrong in assuming that the shelf
> holding the TV had been consumed in the fire (as noted
> supra, Thomas's interpretation of one of Cady's photos
> suggests that at least part of the shelf survived), it
> does not follow that his opinion as to the fire's
> origin is based on the "absence of evidence," in
> violation of NFPA 921.  In fact, as discussed supra,
> Simard's opinion is based principally on the presence
> of burn marks on the left side of the partition on the
> shelf below the television, where the cable box and
> home theater were located;
>
> (b) Simard identified the origin of the fire, not its
> cause--as he explained, he left that to Thomas--so it
> strikes the court as not particularly important that
> Simard did not identify the ignition source or the
> first material ignited, particularly in the absence of
> any well-supported, or even well-developed, argument by
> the defendants on this point; and
>
> (c) as this court has previously noted, NFPA 921
> specifically contemplates that testing of a fire
> investigator's hypothesis "may be either cognitive or
> experimental," so that a fire investigator's failure to
> employ "re-creatable testing" in reaching a conclusion

does not render it unreliable, Adams, 671 F. Supp. 2d at 273 (quoting and adding emphasis to NFPA 921 and citing cases).

Despite these alleged flaws, then, the court finds that Simard's anticipated testimony as to the origin of the fire is based upon sufficient facts or data, and is the product of reliable principles and methods which he has applied reliably to the facts of the case.  See Fed. R. Evid. 702.  The defendants' motion to preclude Simard's testimony is denied without prejudice to their objecting to his testimony later in the proceedings.

###    2.    **Thomas**

The defendants argue that Thomas is unqualified to opine that the fire was "a result of a component failure/overheating of the power supply" in the home theater unit because Thomas lacks experience in evaluating "consumer electronic products or electric appliances."  This argument fails for lack of merit.

Thomas, who has worked as a forensic engineer since 1991, testified that he handled fire cases "right from the beginning," including fire cases that involved appliances.  He has also worked in research and development for two different companies, testing and analyzing electrical products, and holds an undergraduate degree in engineering science, with an emphasis in mechanical and electrical engineering.  While emphasized by the defendants, the facts that Thomas "cannot demonstrate . . . where

he has investigated fires of similar circumstances" or "has never been involved in the design of a DVD player" do not disqualify him from opining that the home theater was the cause of the fire here, because Rule 702 does not demand such an exacting fit between an expert's experience and opinions.  See Part III.A.1, supra.  The court rules that Thomas is qualified to render his disclosed opinions in this case.

The defendants also argue that "Thomas's methodology is biased, speculative, and therefore unreliable."[5]  Their principal charge is that his theory that the fire started inside the home theater system, which identifies the five-disc DVD tray inside the system as the "initial fuel package," fails to account for the fact that portions of the tray survived the fire.  But, when asked to explain this at his deposition, Thomas stated that a fire requires "both a competent fuel source and a competent supply of oxygen, and there's only a limited supply of oxygen within that unit."

Rather than "fail[ing] the test of logic," as the defendants argue, this explanation seems consistent with this court's layman's knowledge of fires--and, as already noted, the

_____

[5]As is the case with the defendants' memorandum in support of their motion to exclude Simard, see note 4, supra, the defendants state in a subject heading of their memorandum in support of their motion to exclude Thomas that his "methodology . . . is biased," but nowhere explain what they mean by that.

defendants do not rely on anything from their own expert to cast
doubt on Thomas's explanation, let alone show that it is
unreliable.  Instead, the defendants simply assert that Thomas
"offered no explanation as to why there would be sufficient
oxygen to start the fire inside the [home theater system], but
not enough oxygen to allow all of the plastic carousel to burn."
In fact, Thomas explained that the area of the carousel tray that
did not burn was "a dead zone from an oxygen flow standpoint"
because there was "very little in the way of venting over in that
area of case" enclosing the home theater's components (which, as
discussed above, contained ventilation holes only in certain
spots).[6]  The defendants have offered nothing to suggest that
this theory is fundamentally inconsistent with accepted
principles of fire science so as to render Thomas's opinions
inadmissible.

---

[6]The defendants also complain that Thomas relied solely on
"deductive analysis" to arrive at this explanation but, as
already discussed, that is an acceptable methodology of fire
investigation under NFPA 921.  See Part III.A.1, supra (citing
Adams, 671 F. Supp. 2d at 273).  Furthermore, Thomas did test an
exemplar of the carousel tray, and found that it "lit and
maintained a fire."  At oral argument, the defendants protested
that Thomas had failed to reference this testing in his report
and, for that reason, should not be permitted to testify about it
at trial.  But this court ordinarily does not consider points
made for the first time at oral argument.  See Doe v.
Friendfinder Network, Inc., 540 F. Supp. 2d 288, 304 n.19 (D.N.H.
2008).  If the defendants wish to press this objection, they
should raise it in a pre-trial motion in limine.

The defendants also suggest that the lack of evidence of
"arcing" inside the home theater system necessarily means that it
could not have served as the source of the fire.  The defendants
state that "[t]he fire investigation community considers the lack
of arcing in a burned appliance proof that the appliance was not
energized at the time of the fire.  If an appliance is not
energized at the time of the fire, it cannot be considered a
cause of the electrical fire."  But the defendants fail to
provide any record support for this statement, and Thomas, for
one, disagrees with it--he testified that it "is typical to have
a fire that's labeled as electrical and not have evidence of
electrical activity," i.e., arcing.  Furthermore, despite the
defendants' suggestion to the contrary, NFPA 921 does not require
evidence of arcing to support the conclusion that a fire was
electrical in nature.  Indeed, the very portions of NFPA 921
relied on by the defendants say that an investigator can rely on
other information to reach that conclusion, and recognize (as
Thomas testified) that "[a]bnormal electrical activity will
usually produce characteristic damage that may be recognized
after a fire" (emphases added).  Under the standards the
defendants themselves invoke, then, the lack of signs of arcing
does not make Thomas's opinion unreliable.

17

The defendants' remaining objections to Thomas's methodology are likewise without merit.  Specifically:

   (a) the defendants criticize Thomas for failing to realize that the printed circuit boards within the home theater were made of flame-retardant material, but the court is at a loss to see how that renders his opinion unreliable, since he believes that the carousel tray, rather than the circuit boards, was the initial fuel for the fire;

   (b) the defendants argue that "Thomas does not know enough about the safety devices equipped in the" home theater unit, specifically, a "switch mode power supply," but Thomas explained that this component would not have prevented the fire from starting in the manner he concludes it did, and the defendants have offered nothing to suggest that this view is mistaken; and

   (c) the defendants argue that Thomas "offered no engineering analysis to explain why the DVD player was a more likely candidate for the cause of the fire as opposed to the TV, the Wii or the cable box," but, in fact, Thomas explained at his deposition that burn patterns excluded the television and the Wii as sources of the fire, while the cable box was excluded because it "had no power sources in the affected area and the power supply which was on the opposite side of the unit remained generally intact."

So the defendants' criticisms of Thomas's methodology, like their criticisms of Simard's methodology, serve at most as potential areas of inquiry on cross-examination at trial.  They do not render Thomas's opinion that the fire resulted from "a component failure/overheating of the power supply" in the home theater system unreliable under Rule 702.  The defendants' motion to exclude Thomas's testimony is denied without prejudice to their objecting to his testimony later in the proceedings.

**B.   Defendants' motion for summary judgment**

As noted at the outset, one of the bases for the defendants' summary judgment motion is that Simard and Thomas cannot offer expert testimony as to the cause and origin of the fire and that, without this testimony, MMG cannot prevail on any of its claims. The defendants are not entitled to summary judgment on this basis, however, because, as just discussed, Simard and Thomas are qualified to opine that the fire originated in the Samsung home theater unit, due to an electrical failure there, and those opinions are sufficiently reliable to be admissible at trial. See Masello v. Stanley Works, Inc., 2011 DNH 061.

The defendants also seek summary judgment "as a sanction of dismissal based on [MMG's] spoliation of the evidence," particularly, its "mishandl[ing] of the fire scene."  As a "companion to" the spoliation doctrine, which "permits an adverse inference from one side's destruction of evidence," a court has the "inherent power" to sanction a party who has "improperly altered or damaged" evidence.  Sacramona v. Bridgestone/ Firestone, Inc., 106 F.3d 444, 446 (1st Cir. 1997).  While the authorized punishments for spoliation by a plaintiff include dismissal of the case, the Court of Appeals has cautioned that it "views dismissal with prejudice as a harsh sanction, which runs counter to [its] strong policy favoring the disposition of cases

19

on the merits." Collazo-Santiago v. Toyota Motor Corp., 149 F.3d 23, 28 (1st Cir. 1998) (quotation marks omitted).

The defendants have not shown that the harsh sanction of dismissal is appropriate here. As an initial matter, it is not clear from the defendants' motion and supporting memorandum precisely what evidence they accuse MMG of improperly altering or destroying. They point out that, by the time Long and Simard inspected the scene, "emergency repair personnel had been inside the house, and through the area of origin." But the presence of "emergency repair personnel" in the aftermath of a house fire strikes the court as unsurprising, if not inevitable, rather than "improper." Furthermore, the defendants have not shown that the presence of these people, in and of itself, "altered or damaged" any evidence. Sacramona, 106 F.3d at 446.

The defendants suggest that, based on a comparison of Cady's photographs of the scene to the testimony of MMG's experts as to what they observed upon their arrival, certain items that survived the fire were missing, including the shelf that held the television and some of the television's components. Putting aside the fact that this is only one permissible view of the evidence (another view, based on the materials presently before the court, is that at least some of those items did not in fact survive the fire), the defendants do not explain how MMG bears

any responsibility for whatever firefighters, or other emergency
personnel, might have done to items involved in the fire before
MMG's investigators had even arrived.  Nor, even more
importantly, have the defendants even tried to articulate any
prejudice they have suffered from the absence of the shelf and
components.  Just like MMG's investigators, the defendants had
access to Cady's photograph of the shelf, and the only evidence
in the record as to the significance of the television components
is Thomas's testimony that their absence does not shake his
confidence that the television was not the source of the fire.[7]

The defendants also complain that Long and Simard
"process[ed] the evidence within the entertainment center,
improperly manipulating the artifacts suspected as the direct
cause of the fire . . . .  As a result, debris was lost, and it
will never be know [*sic*] whether Simard and/or Long discarded or
altered evidence."  But this rather strong charge is
unaccompanied by any citation to the record which, so far as the
court can tell, does not support it.  Simard testified that he

---

[7]At oral argument, the defendants suggested that the shelf
must have gone missing after the firefighters had left, but
before Long and Simard arrived, since Cady was able to take a
photograph of it--and that culpability for the lost shelf lies
with MMG based on its failure to secure the scene in the interim.
But, again, this is not the only plausible explanation for the
fate of the shelf and, even if it were, the defendants have not
show resultant prejudice sufficient to warrant dismissal of the
case as a sanction.

and Long "systematically cleared" the debris around the
entertainment center "via the layering method," i.e., "removing
debris from the top down and observing the relative location of
artifacts."  In this process, they removed "anything that looked
electrical, wiring or anything like that," placing it in bags,
and leaving the rest of the debris, which was "structure-
related," in place.  So Simard did not, contrary to what the
defendants say, "admit" to "improperly manipulating" any of the
debris, nor is there evidence that any of it was "lost" by MMG's
investigators.  Rather, as just discussed, any "lost" debris
(such as the television shelf or television components) was
already missing by the time Long and Simard arrived.

       Long and Simard did "admit" to encasing the entertainment
center itself in shrink wrap and moving it, together with the
debris they bagged, from the living room into the garage.  Simard
explained that they did this, however, so that the workers on the
site could secure the ceiling above.  As MMG points out, NFPA 921
specifically recognizes that "[p]hysical evidence may need to be
moved prior to the discovery of the cause of the fire," including
to "ensure that it is protected from further damage."  Indeed,
NFPA 9221 provides that "[i]n and of itself, such movement of
evidence or alteration of the scene should not be considered
spoliation of evidence."  The defendants have not questioned

Simard's claimed need to move the entertainment center, nor, more importantly, have they offered anything (beyond a conclusory assertion) to show that this prejudiced their ability to conduct their own investigation into the fire--an investigation which began the very next day, after Long and Simard identified Samsung as the manufacturer of one of the appliances at the site of the fire's origin and the company dispatched both an investigator and an attorney to the scene.  If the movement of the entertainment center, or anything else Long and Simard did, hampered the defendants' investigation in any way, one would expect them to explain how, e.g., through an affidavit from their own expert. The absence of any such evidence makes the defendants' spoliation argument more or less impossible for this court to accept.

As the defendants recognize, "of particular importance when considering the appropriateness of [spoliation] sanctions [are] the prejudice to the non-offending party and the degree of fault of the offending party." Collazo-Santiago, 149 F.3d at 28. While, contrary to MMG's argument, "bad faith is not essential" to imposing a spoliation sanction, the defendants have failed to attribute even "carelessness" to MMG in its handling of the fire scene. Sacramona, 106 F.3d at 447. Nor, even more importantly,

have the defendants even attempted to show any prejudice.[8]  So
their motion for summary judgment based on MMG's alleged
spoliation of evidence is denied.  If the defendants wish, they
may request an instruction at trial informing the jury that they
may draw an adverse inference from MMG's spoliation.  See, e.g.,
Booker v. Mass. Dep't of Pub. Health, 612 F.3d 34, 45-47 (1st
Cir. 2010).  As with any other requested instruction, of course,
the court will give it only if it is consistent with controlling
law and supported by the evidence.

## IV.  Conclusion

For the foregoing reasons, the defendants' motions to
preclude Simard[9] and Thomas[10] from testifying, and the defendants'
motion for summary judgment,[11] are DENIED.  MMG's motions to

---

[8]This court is sensitive that "'courts must not hold the
prejudiced party to too strict a standard of proof regarding the
likely contents of the destroyed evidence because doing so allows
the spoliators to profit from the destruction of evidence.'"
Rockwood v. SKF USA, Inc., 2010 DNH 171, 22 (quoting Se. Mech.
Servs., Inc. v. Brody, 657 F. Supp. 2d 1293, 1300 (M.D. Fla.
2009)).  Here, however, the defendants have not even ventured an
explanation as to how they might have been prejudiced by MMG's
handling of the fire scene; instead, they seem to take the
position that any manipulation of the scene before their
investigator arrived entitles them to dismissal of the case.
That is not the law of spoliation in this circuit.

[9]Document no. 27.

[10]Document no. 28.

[11]Document no. 29.

strike[12] the defendants' motions to preclude its experts and the defendants' motions[13] for leave to file those motions are DENIED as moot.  See note 1, supra.

   **SO ORDERED.**

           _____
           Joseph N. Laplante
           United States District Judge

Dated: April 16, 2013

cc: Charles W. Grau, Esq.
  Lisa Hall, Esq.
  Michael S. McGrath, Esq.
  Robert W. Upton, II, Esq.
  Thomas DeMicco, Esq.
  Christopher P. Flanagan, Esq.

---

[12]Document nos. 34-35.

[13]Document nos. 51-52.